FILED IN CHAMBERS

JUN 1 8 2014

U.S. MAGISTRATE JUDGE
N.D. GEORGIA

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

Craig Douglas Near

**CRIMINAL COMPLAINT**

Case Number: 1:14-MJ-602

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about February 2009 through on or about June 1, 2014 in Fulton County, in the Northern District of Georgia, defendant did: 1) having devised a scheme and artifice to defraud the United States, and for obtaining money or property by means of false or fraudulent pretenses, representations, and promises, transmit and cause to be transmitted by means of wire communication in interstate commerce, writings and signals for the purpose of executing such scheme and artifice; and 2) knowing that certain property in financial transactions represented the proceeds of some form of unlawful activity, conduct financial transactions which in fact involved the proceeds of said wire fraud scheme, with the intent to promote the carrying on of said wire fraud scheme.

in violation of Title 18, United States Code, Sections 1343 and 1956.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

Signature of Complainant
Lee R. Gibson

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

June 18, 2014 @ 2:40                             at   Atlanta, Georgia
Date                                                    City and State


ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

Name and Title of Judicial Officer                  Signature of Judicial Officer
AUSA Alana R. Black / 2014R00409

**AFFIDAVIT**

I, Lee R. Gibson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of a criminal complaint for an arrest warrant for Craig Douglas Near for wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1956.

2.      I am a Special Agent with the National Aeronautics & Space Administration, Office of Inspector General, and have been for approximately one year. My duties include investigating violations of federal criminal law involving NASA, including procurement fraud. I am a graduate of Auburn University with a Bachelor's in Criminology. In 2013, I completed the 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. In 2014, I completed the four-week Inspector General Investigator Training Program at the Inspector General Academy located at the FLETC.  Prior to becoming a federal law enforcement agent, I served as an Officer (O-3) in the United States Navy for over seven years, completing numerous deployments as a Mission Commander aboard the E-6B Mercury nuclear command and control aircraft, and completing a tour as an Operations Officer with the Defense Intelligence Agency.

3.      While attending the Criminal Investigator Training Program and the Inspector General Investigator Training Program at FLETC, I completed a course in computer and electronic evidence, focusing on the fundamentals of searching and retrieving evidence located on computers and other digital devices capable of data storage. I also completed a course in the

seizure of electronic evidence that included the proper handling, documentation, and storage of computers and other digital evidence.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The information presented herein was gathered through investigation by Special Agents of National Aeronautics and Space Administration (NASA) Office of Inspector General (OIG), the National Science Foundation (NSF) OIG, the United States Secret Service, and grand jury subpoena.  It is based on my personal knowledge of this investigation, including a review of documents and records such as bank records and contract proposals, as well as on witness interviews and communications with others who have personal knowledge of the events and circumstances described herein.

## PREDICATE OFFENSES

5.     Title 18, United States Code, Section 1343, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

6.     Title 18, United States Code, Section 1956, provides, in relevant part:

> (a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

2

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986 . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. . . .

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States –

(A) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. . . .

18 U.S.C. § 1956.

7.    The term "specified unlawful activity" is defined to include any act indictable under the wire fraud statute, 18 U.S.C. § 1343.  18 U.S.C. §§ 1956 (c)(7)(A), 1961(1)(B).

## PROBABLE CAUSE

### Summary and Scheme Overview

8.    As set forth in greater detail below, there is probable cause to believe that from June 10, 2008 through May 31, 2014, Genziko, Incorporated (GENZIKO) and its principal, Craig Douglas Near (NEAR), engaged in a scheme to defraud NASA and NSF by submitting multiple fraudulent contract proposals, and by using government funds paid on awarded contracts for purposes other than those intended, and that GENZIKO and NEAR have sent certain wire transmissions in furtherance of this scheme.  The proposals were fraudulent because GENZIKO and NEAR falsely claimed that they would pay Georgia Tech to complete

3

work on the contracts at issue, and because they claimed they would pay for work by phantom employees, among other misrepresentations. Furthermore, there is probable cause to believe that Near has engaged in money laundering by engaging in certain transactions in the proceeds of the wire fraud scheme, with the intent to promote the wire fraud activity.

**Background of SBIR/STTR Programs**

9.      The Small Business Administration administers the Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) Programs. The statutory purposes of the programs are to strengthen the role of innovative small business concerns ("SBCs") in federally funded research and development, and increase competition, productivity and economic growth. Eleven federal agencies, including NASA and NSF, currently participate in the SBIR and STTR programs.

10.     The SBIR program is divided into two funding and development stages relevant to this investigation: Phase 1 and Phase 2. A contractor cannot be awarded a Phase 2 contract without finishing Phase 1. Both types of contracts are competitive and require the SBC to submit a proposal for consideration. The proposal is submitted electronically to the relevant federal agency.

11.     If the proposal is chosen, then a contract is negotiated between the agency and the SBC, and signed by both. The contract incorporates by reference the terms of the proposal, including the budget, as the contract's "statement of work."

12.     SBIR Phase 1 contracts at NASA and NSF typically last up to six months with a maximum funding of $100,000.

4

13.     Phase 2 contracts require reporting on the work and results accomplished, and whenever possible, the delivery of a prototype unit or software package, or a more complete product or service, for government testing and utilization.  At the time of award, SBIR Phase 2 contracts at NASA and NSF are typically for a period of 24 months with a maximum funding of $600,000.

14.     Companies are entitled to earn profits or fees under the SBIR Program. However, the profit or fee must be included in the budget request, and the amount of the fee approved by the agencies participating in the program normally will not exceed 7% of total costs for each phase of the project.

15.     NASA issues annual combined solicitations for the SBIR and STTR Programs each July via the NASA SBIR/STTR website located at http://sbir.nasa.gov.  The solicitations provide all the information needed for the offeror to submit proposals.  Only firms qualifying as SBCs under the SBA are eligible to participate in the SBIR/STTR Programs.

16.     To submit Phase 1 and Phase 2 certified proposals to NASA, the offeror must complete proposal sections including:  (a) a certification cover sheet; (b) a description of the work, including, but not limited to, the technical objectives, work plan, related research and development, key personnel working on the project, possible efforts for commercialization, information about company facilities, a disclosure of subcontractors and consultants, and the potential applications of the project; and (c) a budget summary which explains the use of the requested government funds, and which enables government officials to determine whether the proposed budget submitted by the offeror is fair and reasonable.  The offeror must electronically submit and upload all proposals via the internet onto a computer system called

5

the "NASA Electronic Handbook," where the proposals are evaluated and reviewed by NASA officials for possible award.

17.     Special requirements apply to the budget summary that must be submitted to NASA. Specifically, the offeror must submit to NASA a certified pricing proposal of estimated costs, with detailed information for each of the following cost elements: (a) direct labor costs, which specify hourly labor rates of employees, hours needed to complete the project, and total costs (i.e., hourly labor rates x hours needed to complete the project, + any additional overhead costs = total costs) for each employee; (b) other direct costs ("ODCs"), which include costs for materials, supplies, tools, equipment, accessories, subcontractors and travel needed to complete the project; and (c) general and administrative ("G&A") costs, which encompass business operating expenses not directly linked to the company's products or services, such as employee benefits, corporate taxes, business development, marketing and sales, etc.

18.     Unless the contract is modified by the parties, the offeror is only entitled to what it budgeted for in its proposals. Thus, the budgeted amount for the specific direct labor costs, ODCs and G&A costs are the maximum amounts that can be invoiced by the company, and paid out by the government under the contract. The government will fund up to the maximum amounts on Phase 1 and Phase 2 proposals; however, if a company can perform the contract for less than the maximum amounts, it must request an amount less than the maximum set out in its certified proposal.

19.     Each proposal is judged and scored on factors such as: (a) the scientific/technical merit and feasibility of the project; (b) the experience and qualifications of

6

key personnel, subcontractors, and the capabilities of the company's facilities; (c) the effectiveness of the proposed work plan; and (d) the commercial potential and feasibility. Before a contract is awarded, the Government relies upon all of the information provided by the offeror regarding key personnel, subcontractors, hourly rates, and costs in order to negotiate the contract amount, and determines whether the offeror's budget represents a fair and reasonable price. If the proposal is selected, and if the government believes these cost representations are fair and reasonable during cost negotiations, the contract will be awarded and portions of the proposal will then be incorporated into the contract as the statement of work.

20.     To submit SBIR/STTR proposals to NASA, the offeror must electronically certify that he or she understands that "providing false information is a criminal offense under Title 18, United States Code, Section 1001, False Statements, as well as Title 18, United States Code, Section 287, False Claims." This certification expressly includes the fact that the Principal Investigator ("PI") is "primarily employed" by the SBC, as well as the number of individuals employed by the SBC.

21.     To receive payments from NASA, an SBC must electronically submit its proposals, progress reports, invoices, and final reports, via wire, to NASA through the NASA Electronic Handbook. Once an SBC uploads reports and invoices, the NASA Contracting Officer Representative ("COR") reviews the reports, and then sends confirmation of acceptance to the Contracting Officer ("CO") for payment. Payments from NASA to SBCs are distributed from the NASA financial office located at the NASA Shared Services Center (NSSC") in Mississippi.

7

22.     NSF requires small businesses that have been awarded an SBIR contract to submit a final report at the conclusion of the contact term.  An NSF awardee typically receives 2/3 of the contract payment upon award, and the final 1/3 after submission and approval of the final report.

23.     Like NSF, NASA also requires SBIR awardees to submit a final report, and also makes an initial payment and a final payment to awardees.  Unlike NSF, NASA requires SBIR awardees to file interim reports during the contract term.  NASA makes payments to the awardee after the receipt of each of these interim reports.  The proposal, the interim reports (if any), and the final report must all be certified on Form A.

**Background Concerning Near and Genziko, Inc.**

24.     According to the Georgia Secretary of State, Corporations Division, GENZIKO was incorporated on September 28, 2004.  The mailing address of the initial principal office of GENZIKO is listed as: 1290 Compass Point Crossing, Alpharetta, GA 30005.  Three directors of the corporation are listed:  1) NEAR at 1290 Compass Point Crossing; 2) Timothy J. Meyer at 141 Manzinita Street, Howard, Pennsylvania 16841; and Donald W. Bacso, 1420 Sea Pines Street, Mesquite, Nevada 89027.  The most recent "Corporation Annual Registration" filed on April 29, 2014, lists the same three board members, and still lists NEAR at the Compass Pointe Crossing address.  The registration also lists GENZIKO's address as 3070 Windward Plaza, Suite F-275, Alpharetta, Georgia, 30005, which is a UPS Store post office box.

25.     In a biography of NEAR submitted to NASA in the Phase II proposal, NEAR describes himself as the President and Founder of GENZIKO, "with 22 years of management experience in market-driven piezoelectric ceramic and device product, process, technology,

and operations development, and in new business development, in over fifty industries . . . ."
Similar biographical information was submitted by NEAR as part of other proposals in the
scheme.

26.     The proposals also state that NEAR holds a B.S. in ceramics from Northwestern
University, "has conducted graduate studies" in ceramic studies at Penn State, and holds an
M.S. in Technology Management from Georgia Tech.  NEAR states he holds 9 granted
patents, and has 2 patent applications pending.

27.     NEAR is married to Dominique Mbomba Near (MBOMBA).  I obtained
divorce pleadings from the Fulton County Superior Court pertaining to a pending divorce
action between them, as well as a prior divorce action which did not result in divorce.  As part
of the pending action, filed March 12, 2013, both parties have filed verified pleadings.  An
analysis of the pleadings show that both parties are residing in the Compass Pointe address,
along with the couple's three children (born 1998, 2001 and 2005), although the parties
describe themselves as being "separated."  In the verified complaint filed in March, 2013,
NEAR states that his sole monthly income is $5,495.00, from GENZIKO.  In a financial
affidavit dated May 14, 2013, MBOMBA states that the average monthly expenses for herself
and her children are $12,678.44, and that she is a homemaker with no income from any source.
In the same document, MBOMBA claims to own a 90% interest in GENZIKO, which she
describes as being involved in "Translation, Management & Financial Services."

28.     NEAR frequently communicated with NASA and NSF via email when
representatives of those agencies asked him for contract-related information.  NEAR used the
email address genziko@comcast.net for these communications.  Additionally, staff and faculty

members of the Georgia Institute of Technology report that NEAR used the same genziko@comcast.net email address to communicate with them about, and receive invoices for, work on the NASA and NSF contracts.

29.     As part of this investigation, in late May 2014, agents submitted a written request to the Georgia Department of Labor for information concerning all wages paid by GENZIKO to any individuals.  On June 4, 2014, the Georgia Department of Labor responded that it had no records of wages being paid by GENZIKO to any individual whatsoever for the last five calendar quarters, which was the period for which records were checked.

30.     As part of this investigation, tax records for GENZIKO, NEAR, and MBOMBA were obtained from the Georgia Department of Revenue ("GA DOR") for tax years 2009 through 2013.  On 6/3/14, the GA DOR certified that it has no tax records of any sort for GENZIKO for any of those years, including records of wage withholding.  The GA DOR also certified that it has no records for NEAR or MBOMBA for tax years 2009 and 2011.  For tax years 2010, 2012 and 2013, the GA DOR provided copies of joint state personal tax returns filed by NEAR and MBOMA.  NEAR and MBOMBA reported only modest income for each of those tax years.  Specifically, NEAR and MBOMBA reported adjusted gross income of only $291 for 2010, $24,802 for 2012, and $7,834 for 2013.

**Funded Government Contracts**

31.     Since January of 2009, GENZIKO has been awarded at least three SBIR

contracts with the federal government (specifically NASA and NSF), with a total value of

approximately $798,845. Information regarding GENZIKO's three awards is detailed in the

table below:

| Contract # | Agency / Phase | Title | Total Value | Payments | | Performance Period |
|---|---|---|---|---|---|---|
| IIP-0839600 | NSF/I | SBIR Phase I:  High Performance Vibration Energy Harvester | $99,847 | 1/6/09 | $66,564 | 1/01/2009 - 6/30/2009 |
| | | | | 9/2/09 | $33,283 | |
| NNX10CE47P | NASA/I | Frequency Steered Acoustic Transducer | $99,828 | 2/3/10 | $30,000 | 1/29/2010 - 7/29/2010 |
| | | | | 4/26/10 | $30,000 | |
| | | | | 7/29/10 | $39,828 | |
| NNX11CB85C | NASA/II | Frequency Steered Acoustic Transducer | $599,170 | 8/2/11 | $22,000 | 6/01/2011 - 03/31/2014 |
| | | | | 10/13/11 | $70,000 | |
| | | | | 1/26/12 | $70,000 | |
| | | | | 4/6/12 | $70,000 | |
| | | | | 7/16/12 | $70,000 | |
| | | | | 12/6/12 | $70,000 | |
| | | | | 2/20/13 | $70,000 | |
| | | | | 4/10/13 | $48,000 | |
| | | | | 4/25/14 | $80,000 | |
| | | | | 5/12/14 | $29,170 | |
| **TOTAL** | | | **$798,845** | | | |

32.     As described above, each payment listed in the preceding table that GENZIKO

received from NSF or NASA came only after the electronic submission of a unique proposal,

interim report, or final report by GENZIKO to the relevant agency.  Among other information,

each of these submissions included budget figures in which GENZIKO and NEAR made

representations to federal agency contracting officials about how the funds at issue were going

to be used, or how they had already been used.  As described in greater detail below, the

11

budget figures provided by GENZIKO and NEAR in each of these submissions contained material misrepresentations and falsehoods.  NEAR did not use the government funds as proposed in the budget, instead using them to pay for day-to-day living expenses for himself and his family.

33.     As part of this investigation, bank records for multiple accounts owned by GENZIKO were obtained from Bank of America and Fifth Third Bank for the period January 2009 through July 2013.  These records have been analyzed and scheduled.  Recently, I learned that GENZIKO also has or had one or more accounts at Renasant Bank, into which the two most recent payments on the NASA Phase II contract were deposited, on 4/25/14 and 5/12/14. Records from Renasant bank have not yet been obtained.

34.     GENZIKO received funds from the government for the NSF and NASA Phase I awards to a business checking account at Bank of America ("BoA"), x1809, from January 2009 until the account was closed in May 2011.  Records for the BoA x1809 GENZIKO ("operations account") showed transfers to other BoA accounts, including:  x1817 (GENZIKO payroll account), x5705 (GENZIKO business savings), and an additional checking account, x7891.  Funds were repeatedly transferred from the BoA x1809 GENZIKO operations account into checking account x7891, which appears to be a personal checking account used by NEAR. Records for the x7891 account have not yet been obtained and analyzed.

35.     GENZIKO received federal funds for the NASA Phase II award to a business checking account at Fifth Third Bank, x3343, from June 2011 until July 2013, the bank records for which have been obtained and analyzed as part of this investigation.  The last two payments

12

to GENZIKO for the NASA Phase II were sent to a checking account at Renasant Bank,
records for which have not yet been obtained and analyzed.

36.     As described in greater detail below, the GENZIKO bank records that have been
analyzed as part of this investigation reveal that GENZIKO did not expend any funds matching
several categories of budgeted expenses.  For example, contracts refer to lease expenses,
employee salaries, consulting services, and subcontractor expenses which were never paid.
Instead, funds earmarked for these expenses were used for a variety of personal purposes
benefitting NEAR and his family.  These personal expenditures, which were made directly out
of GENZIKO accounts and not out of NEAR's personal bank accounts, included tuition for
private school for NEAR's children, mortgage payments for NEAR's home at the Compass
Pointe address, entertainment, groceries, and wire transfers to individuals in various African
nations, at least some of whom appear to be relatives of NEAR's wife MBOMBA.

    NSF Phase I

37.     The Summary Proposal Budget submitted by NEAR for the NSF Phase I
contract included $25,000 for himself as Principal Investigator.  Additionally, it included
$10,180 for two other professionals, and $8,500 for one "other personnel" – a total of $18,680.
In a narrative on the "Budget Justification Page," NEAR wrote that two technicians, in addition
to himself, would work on the project for 6 months.  NEAR also stated that electronic test
equipment would be rented for an estimated $3,300 for one month.  The proposal stated that
GENZIKO currently had 4 employees.  Finally, NEAR stated that Georgia Tech would be
conducting characterization work for $14,000.

13

38.     Subsequently, an SBIR/STTR Program Manager at NSF asked NEAR for a breakdown of certain items in the summary proposal budget, including the funds payable to Georgia Tech.  On September 25, 2008, by email, NEAR responded by providing the following figures:

| Item – GA Tech | COST |
|---|---:|
| Lease | $3,000 |
| [Professor B] | $4,740 |
| Fringe | $1,251 |
| OH (Over Head) | $5,008 |
| **TOTAL** | **$13,999** |

39.     On May 8 and June 17, 2014, I interviewed Christ D'Urbano, Manager, Office of Sponsored Programs, Georgia Tech.  Mr. D'Urbano explained to me that his office oversees all research contracts and grants at Georgia Tech.

40.     However, Mr. D'Durbano was readily familiar with GENZIKO and NEAR, having met previously with NEAR to attempt to resolve a dispute between Georgia Tech and GENZIKO related to a prior private (non-government) contract, concerning research to be conducted by the laboratory group led by Professor B.  The meeting included Professor B and the Georgia Tech Finance Office, to discuss the non-payment from GENZIKO on that private contact.  D'Urbano stated NEAR indicated at the meeting that he would pay the invoices, however payment was never received.  The private contract between Georgia Tech and GENZIKO had been for approximately $111,000.  Of that amount, GENZIKO had paid approximately $11,000, or 10%, up front.  GENZIKO had never made any other payments to

14

Georgia Tech on the private contract. Mr. D'Urbano confirmed that Georgia Tech has never had any other commercial arrangement with GENZIKO, including any government contract.

41.     D'Urbano stated that GENZIKO had never arranged, nor made any payment for, any lease of space from Georgia Tech.

42.     I interviewed Professor B on May 28, 2014, and she has provided me with follow-up information after the interview. Professor B informed me that she had been involved in a with a contract between Georgia Tech and GENZIKO. Professor B provided me with a copy of an e-mail dated 2/3/2011, in which Mr. D'Urbano notified GENZIKO and NEAR that "the research agreement dated 12/2/2008 between Genziko and the Georgia Tech Research Corporation" was terminated for nonpayment of invoices.

43.     Professor B shared documents with me showing that the total amount of the 12/2/2008 contract was approximately $111,152, and that the amount of unpaid invoices prompting Georgia Tech to terminate the contract was $58,980.93.

44.     Professor B stated that, in the past, she and NEAR had some preliminary discussions about her research group performing work on a contract with GENZIKO. However, Professor B never agreed to work with NEAR on any government contract. Moreover, Professor B stated that she had not had any dealings with GENZIKO or NEAR since Georgia Tech terminated its contract with GENZIKO for nonpayment.

45.     Review and analysis of GENZIKO's bank records for December 2008 through January 2010 confirms this information from Georgia Tech and Professor B. There is no evidence of any payment from GENZIKO to Georgia Tech, for any purpose. There is also no evidence of any payment from GENZIKO directly to Professor B.

15

46.     Review and analysis of GENZIKO's bank records for December 2008 through January 2010 also shows no evidence of any payment to any individual consistent with the $18,680 payable to other people under the contract ($10,180 for two technicians, and $8,500 for one "other personnel").

47.     Review and analysis of GENZIKO's bank records for December 2008 through January 2010 show that the lion's share of GENZIKO's funding during that time period came from the NSF Phase I contract. NSF deposited a total of $99,847 into GENZIKO's accounts during the period: $66,564 in January 2009 and $33,283 in September 2009. By contrast, GENZIKO received only $13,170 in funds from all other sources combined during the same time period: a $25 opening bank deposit in December 2008; $100 in August 2009 (a cash deposit); $20 in October 2009 (an ATM deposit of funds from an unknown source); $11,625 in November 2009 (two check from Sentrinsic, LLC.) ; and $1,400 in January 2010 (a $1,000 wire in from a relative of NEAR, and a $400 cash deposit).

48.     Bank record analysis shows what appears to be the NEAR family beginning to routinely pay a wide range of personal expenses out of the GENZIKO x1809 BoA account as early as January 2009. There are numerous charges to stores such as T.J. Maxx, Publix, and Dillard's. For example, on January 26, 2009 alone, the GENZIKO x1809 BoA account shows the following personal expenditures made by check card, all from funds from the NSF Phase I: $404.29 to Publix; $332.35 to The Picture People; $179.65 to T.J. Maxx; $109.00 to "Tickets* Silver"; a $100 ATM withdrawal; $88.29 to Ruby Tuesday; $73.39 for Proactiv skin care from a mall kiosk; $72.06 to Stride Rite, and another $64.18 at T.J. Maxx, for a total of $1,423.21 in one day.

16

49.     A series of wire transfers to Africa also started in January 2009, with the

infusion of funds to GENZIKO from the NSF Phase I contract.  On January 21, 2009, from a

Western Union location inside a Publix, $4,900 was wired using the GENZIKO x1809 BoA

check card to an individual in Kinshasa, Democratic Republic of the Congo.  This transaction

shows up as a $5,022.50 purchase from Publix in the BoA bank records, but I have obtained

detailed transaction records for this and other wire transfers from Western Union.

50.     I reviewed GENZIKO's bank records for December 2008 through January 2010

to determine total expenditures for legitimate business purposes, making all assumptions in

favor of GENZIKO and NEAR.  For example, I categorized any purchases at electronics

stores, cable bills, utilities, cell phone bills, and office supply stores as being business

expenditures.  Taken together, I calculated the business expenditures made from GENZIKO's

bank accounts for the December 2008 through January 2010 time period to be $9,560.56.

51.     NSF paid GENZIKO a total of $99,847 on the Phase I contract.  With the

exception of the $9,560.56 that is for expenditures that might have been business related, the

remaining $90,286.44 appears to have used by NEAR and his family for personal purposes.

52.     Of course, NEAR was entitled to take some salary under the contract, and

GENZIKO was entitled to make some profit.  NEAR listed his own salary in the Summary

Proposal Budget at $25,000.  NEAR also listed total fringe benefits of $6,600, for himself and

the 3 other purported employees of GENZIKO to work on the contract.  The Summary

Proposal Budget also includes total indirect costs of $16,535.   Finally, the Summary Proposal

Budget lists residual funds (profit) for GENZIKO of $6,532.  Taken together, these figures

17

total $54,667 that, under the interpretation most favorable to NEAR and GENZIKO, they might have been entitled to retain of the contract funds.

53.    Given the pattern of wire transfers and personal purchases make out of GENZIKO's bank accounts from funds from the NSF Phase I contract, the fact that the $90,286.44 of apparently personal expenditures far outstrips the $54,667 that GENZIKO and NEAR might have been entitled to retain, and the fact that 3 phantom employees appear to be listed by GENZIKO on the proposal, there is probable cause to believe that the wire communications sent by NEAR and GENZIKO to NSF in connection with the Phase I contract were part of a fraudulent scheme.

NASA Phase I

54.    The proposed budget for the NASA Phase I contract, certified by NEAR and incorporated into the contract, detailed the following expenses as belonging to a subcontract with Georgia Tech:

| Personal Services | COST |
|---|---|
| GA Tech Professor [R] | $6,048 |
| GA Tech Professor [M] | $5,337 |
| Graduate Research Asst. | $5,925 |
| Fringe Benefits | $2,846 |
| Materials and Supplies | $1,500 |
| Overhead (51% of Direct Costs) | $11,045 |
| **TOTAL** | **$32,701** |

55.    As described above, neither GENZIKO nor NEAR ever had any government-funded contract with Georgia Tech.  Thus, GENZIKO never paid Georgia Tech any of the

$32,701 listed in the Phase II proposal to NASA as attributable to its subcontract with Georgia Tech.

56.    Instead of contracting with Georgia Tech as provided in the budget, GENZIKO made arrangements to compensate Professors R and M directly, as private consultants, for $12,000 and $8,550, respectively, for a total of $20,550. However, according to bank records, interviews of the two professors, and e-mails provided by the professors, GENZIKO never paid Professors R or M any part of even that lower figure.

57.    Evidence obtained through the interviews of Professor R and Professor M, and further confirmed by emails received by Professor R from NEAR's genziko@comcast.net account, revealed NEAR changed the subcontract from Georgia Tech to instead, working with Professors R and Professor M as private consultants. NEAR did not inform the Contracting Officer of this change as required in the contract. In addition, evidence obtained from the above interviews and email, and confirmed by a review of GENZIKO bank records from BoA, shows GENZIKO did not pay Georgia Tech, or Professors R and M, from the funds allocated in the contract. The emails referenced above, sent from NEAR's genziko@comcast.net account on November 9, 2010 and February 11, 2011 (approximately 3 and 6 months after the end of the NASA Phase I respectively), indicates NEAR's desire to have Professors R and M work as consultants to GENZIKO on the NASA Phase II without using Georgia Tech facilities, "as was done on the Phase I program." Additionally, NEAR states "GENZIKO is obligated to pay $8k to (Professor M) and $12k to Professor R as a result of the Phase I program. Professor M stated during the interview she submitted multiple invoices to NEAR via his email account (genziko@comcast.net) for work completed on the NASA Phase I, and never received a reply

19

or payment. In addition, Professor R also stated he had never received payment for the invoices submitted to NEAR for work completed on the NASA Phase I.

58.     GENZIKO also listed an employee other than NEAR on the NASA Phase I proposal. Specifically, the proposal listed a technician, without a name being provided, with a salary of $16,156, plus $7,593.32 in related overhead.

59.     GENZIKO received a total of $99,828 from NASA on the Phase I contract: $30,000 on 2/19/10; $30,000 on 4/26/10; and $39,828 on 7/29/10. During this time period, GENZIKO continued to use the same bank accounts at BoA identified above, until those accounts were closed by the bank in May 2011 in an overdraft status.

60.     To determine GENZIKO's use of funds from the NASA Phase I contract, I have analyzed the BoA bank records from February 2010 through May 2011. During that time period, the lion's share of GENZIKO's funding came from the NASA Phase I contract. My analysis shows a total of $15,464.09 in outside funding to GENZIKO from February 2010 through May 2011: a $1,000 wire on 2/4/10 from a relative of NEAR; a $300 cash deposit on 2/17/10; a $300 cash deposit on 6/16/10; a $500 cash deposit on 7/2/10; a $1,000 incoming wire on 7/9/10 from a relative of NEAR; $200 cash deposit on 7/23/10; a $1,000 incoming wire on 7/30/10 from a relative of NEAR; credits totaling $64.09 from the apparent return or sale of used video games to Gamestop on 8/31/10; a $500 cash deposit on 10/19/10; a $200 counter credit on 12/1/10; a $400 cash deposit on 12/6/10; a $2,500 personal check from a couple in Kansas on 12/23/10; and a $7,500 incoming wire from relatives of NEAR on 12/28/10.

61.     The pattern that NEAR established during the NSF Phase I contract, of the GENZIKO bank accounts for personal purposes, continued throughout the February 2010 through May 2011 time period analyzed for the NASA Phase I contract.

62.     For example, on one day, February 22, 2010, bank records show personal purchases totaling $2,120.23 from the GENZIKO x1809 BoA account, as follows: $623.64 at Dillard's; $360.30 at Target; $227.86 at Publix; $209.96 to DishNetwork; a $200 ATM withdrawal; $158.63 at Barnes & Noble; $120.87 and $64.95 at Gymboree; $43.66 at Simon's Chinese Cuisine; another $42.79 at Dillard's; $26.91 at Burger King; $15 to AT&T; $14.96 at CVS; and another $10.70 at Gymboree.

63.     Additionally, NEAR continued the practice of wiring funds from GENZIKO's accounts to individuals in Africa during the time period he was spending down funds from the NASA Phase I contract.  During September 2010 alone, bank records and Western Union records show a total of $5,650 wired from GENZIKO's accounts in four separate Western Union wires.  Three of these wires, totaling $4,650, were to an individual in Tunisia sharing the surname of NEAR's wife, MBOMBA.

64.     I reviewed GENZIKO's bank records for February 2010 through May 2011 to determine total expenditures for legitimate business purposes, making all assumptions in favor of GENZIKO and NEAR.  For example, I categorized any purchases at electronics stores, cable bills, utilities, cell phone bills, and office supply stores as being business expenditures. Taken together, I calculated the business expenditures made from GENZIKO's bank accounts for the February 2010 through May 2011 time period to be $5,761.42.

65.     NASA paid GENZIKO a total of $99,828 on its Phase I contract.  With the exception of the $5,761.42 that is for expenditures that might have been business related, the remaining $94,066.58 appears to have used by NEAR and his family for personal purposes.

66.     Of course, NEAR was entitled to take some salary under the contract, and GENZIKO was entitled to make some profit.  NEAR listed his own salary in the Form C SBIR Summary Budget at $16,421.40.  NEAR would also have been entitled to overhead of $7,718.06 (47% of his $16,421.40 salary).  The Summary Budget also listed $5,500 in materials and supplies, general and administrative costs for GENZIKO of $7,207.49, and a profit of $6,530.81 for GENZIKO.  Taken together, these figures total $43,377.76 that, under the interpretation most favorable to NEAR and GENZIKO, they might have been entitled to retain of the contract funds.

67.     Given the pattern of wire transfers and personal purchases make out of GENZIKO's bank accounts from funds from the NASA Phase I contract, the fact that the $94,066.58 of apparently personal expenditures far outstrips the $43,377.76 that GENZIKO and NEAR might have been entitled to retain, and the fact that a phantom employee appears to be listed by GENZIKO on the proposal, there is probable cause to believe that the wire communications sent by NEAR and GENZIKO to NASA in connection with the Phase I contract were part of a fraudulent scheme.

NASA Phase II

68.     The proposed budget for the NASA Phase II contract, certified by NEAR and

incorporated into the contract, detailed the following expenses under multiple categories:

| Senior Personnel | COST |
|---|---|
| Craig Near | $49,603.13 |
| Engineer | $34,541.68 |
| Technician | $48,135.58 |
| Travel | |
| Domestic | $4,003.80 |
| Foreign | $0.00 |
| Total Participant Costs | |
| Consulting Services (Kiggans & Heiferling) | $10,000.00 |
| Subcontractors (Univ of Toledo) | $279,999.96 |
| Materials and Supplies | $31,005.06 |
| O/H Costs (47% of Labor) | $62,171.78 |
| G&A (13.5% of Subtotal) | $32,111.24 |
| Fee (7%) | $39,198.06 |

69.     The NASA Phase II contract lists the Compass Pointe address as the address of

GENZIKO.

70.     At the conclusion of the NASA Phase II contract, a NASA Contracting Officer

requested from NEAR, via email, the names of the Engineer and Technician listed on the

contract budget. NEAR responded via his genziko@comcast.net email account on April 23,

2014, that the engineer was Timothy Meyer (Meyer), listed on GENZIKO's website as the

Vice President of Genziko, SHM Operations in Maumee, OH, and as a sales engineer for

Stress Analysis Services.  Near stated the technician was Chris Brooks (Brooks). The final

report of the NASA Phase II contract also lists Meyer and Brooks as members of the

development team at GENZIKO.

71.     The phone numbers listed for NEAR, Meyer, and Brooks are identical (470-336-0075), and come back to a mobile phone registered to NEAR.

72.     GENZIKO received a total of $599,170 from NASA on the Phase II contract, in ten separate payments.  As discussed above, GENZIKO's accounts at Bank of America were closed by the bank in an overdraft status in May 2011.  GENZIKO opened new accounts at Fifth Third Bank ("FTB") in July 2011:  a checking account, x3343, which was the most active; and a savings account, x3434, which was not active.  The first 8 of the 10 payments from NASA on the Phase II contract went into the x3343 account at FTB, from 8/2/2011 through 4/10/2013.

73.     As part of this investigation, I obtained, analyzed and scheduled GENZIKO bank records from FTB for the time period from July 2011 through July 2013.  The accounts were in an overdraft status at the close of the July 2013 statements I analyzed.  My analysis of GENZIKO's accounts for the July 2011 through July 2013 time period did not reveal any wire transfers or other transactions suggesting the existence of an active personal bank account being used by NEAR during that same time period.  Instead, it appeared that NEAR was simply using the GENZIKO accounts in place of a personal account.

74.     During the time period I analyzed, from July 2011 through July 2013, I found no evidence of any payments of any kind to Timothy Meyer or Chris Brooks.  As discussed above, information from the Georgia Department of Revenue confirms that GENZIKO did not report withholding wages for those employees, or any others, for tax years 2009 through 2013.  Similarly, The Georgia Department of Labor confirmed that GENZIKO has not reported paying any wages during the last five quarters, the period checked.  Accordingly, I believe that

the technician and engineer positions listed on the NASA Phase II proposal, which NEAR later clarified in response to Contracting Officer inquiry as being held by Chris Brooks and Timothy Meyer, are fraudulent "phantom employees," who do not actually perform work for GENZIKO.

75.    NASA contracting officials have informed me that the final two payments on the Phase II contract were deposited to a new GENZIKO account, x0460, at Renasant bank. I have not yet obtained or analyzed bank records from Renasant Bank as part of this investigation.

76.    During the time period I analyzed, from July 2011 through July 2013, $490,000 was deposited into GENZIKO's accounts at FTB from the NASA Phase II contract. During the same time period, a total of $7,768 came into GENZIKO accounts from outside sources. Thus, during the July 2011 through July 2013 time period analyzed, the lion's share of GENZIKO's funding came from the NASA Phase II contract.

77.    The pattern of NEAR using GENZIKO bank accounts for personal purposes, continued throughout the July 2011 through July 2013 time period analyzed for the NASA Phase II contract.

78.    For example, on one day, November 28, 2011, bank records show personal purchases totaling $2,593.67 from the GENZIKO x3343 FTB account, as follows:  $14.97 at Little Ceasar's; $21.70 at Auntie Anne's for pretzels; $29.08 at Steak & Shake; $30.18 at Home Depot; $35.99 at Publix; $36.01 at BP; $55 at MetroPCS; another $380.50 at Publix; $522.40 at Admit One New York, a ticket broker; $11.71 at Walmart; $23.26 at JoAnn fabric stores; $34.49 at Michael's; $44.91 at Petco; $53.50 at Mayor's; another $67.20 at Michael's;

25

$114.03 at Barnes & Noble; $120.11 at Target; $281.19 at Whole Foods; and another $717.44 at Barnes & Noble.

79.     Additionally, NEAR continued the practice of wiring funds from GENZIKO's accounts to individuals in Africa and elsewhere during the time period he was spending down funds from the NASA Phase II contract.  During October 2011 alone, bank records and Western Union records show a total of $4,531.54 wired from GENZIKO's accounts in three separate Western Union wires, as follows: on 10/18/11, a $350 wire to a woman in Maine with the same surname as MBOMBA; on 10/19/11, a $2,265 wire to an individual in Tunisia; and on 10/29/11, a $1,916.54 wire to Nationstar Mortgage.

80.     I performed a search of the CLEAR database, and learned that Nationstar Mortgage is listed in that database as the lender holding the mortgage on the Compass Pointe property.

81.     I observed many other payments to Nationstar Mortgage made out of the GENZIKO accounts I analyzed as part of this investigation.  Through Western Union, NEAR made a total of $31,336.10 in payments to Nationstar (including the $1,916.54 described above); additionally, he made another $17,642.50 in payments withdrawn directly from GENZIKO bank accounts.  Thus, NEAR made a total of $48,978.60 in mortgage payments on the Compass Pointe property using federal funds from the contracts at issue in this investigation.

82.     I reviewed GENZIKO's bank records for July 2011 through July 2013 to determine total expenditures for legitimate business purposes, making all assumptions in favor of GENZIKO and NEAR.  For example, I categorized any purchases at electronics stores,

cable bills, utilities, cell phone bills, and office supply stores as being business expenditures. Taken together, I calculated the business expenditures made from GENZIKO's bank accounts for the July 2011 through July 2013 time period to be $154,684.96. This figure includes $79,940 which NEAR paid to a subcontractor, the University of Toledo.

83.     NASA paid GENZIKO a total of $490,000 in the first 8 payments of its Phase II contract, during the July 2011 to July 2013 time period for which FTB bank records were analyzed. With the exception of the $154,684.96 that is for expenditures that might have been business related, the remaining $335,315.04 appears to have been used by NEAR and his family for personal purposes.

84.     Of course, NEAR was entitled to take some salary under the contract, and GENZIKO was entitled to make some profit. NEAR listed his own salary in the GENZIKO Phase II Budget at $49,603.13. GENZIKO was also entitled to material and supply costs of $31,005.06. Outside Micromachining services of $8,400 were also listed, as well as general and administrative costs of $32,111.24. GENZIKO was entitled to profit of $39,198.06, as well as overhead of $23,313.47 (47% of his $49,603.13 salary). Taken together, these figures total $183,630.96 that, under the interpretation most favorable to NEAR and GENZIKO, they might have been entitled to retain of the total contract funds.

85.     As discussed above, I have not yet obtained records from Renasant Bank showing how NEAR and GENZIKO spent the final $109,170 paid out by NASA on the Phase II contract. Even assuming that NEAR changed his pattern entirely, and used this entire amount for legitimate business purposes, NEAR would still have used $335,314.04 for

27

personal purposes. This amount far exceeds the $183,630.96 that NEAR and GENZIKO could arguably have been entitled to, under the generous assumptions outlined above.

86.     Given the pattern of wire transfers and personal purchases make out of GENZIKO's FTB bank accounts from funds from the NASA Phase II contract, the fact that the $335,315.04 of apparently personal expenditures far outstrips the $183,630.96 that GENZIKO and NEAR might have been entitled to retain, and the fact that two phantom employees appear to be listed by GENZIKO on the proposal, there is probable cause to believe that the wire communications sent by NEAR and GENZIKO to NASA in connection with the Phase II contract were part of a fraudulent scheme.

87.     GENZIKO bank records from FTB reveal no indication the "Engineer" and "Technician" detailed in the contract budget were paid, and no indication that any payroll was disbursed from the account to any employee of GENZIKO. In addition, bank records show over $19,000 in travel expenses, in contrast to the $4,003.80 proposed in the budget. With regards to the Subcontractor, bank records from FTB show a total of $79,940 paid to the University of Toledo (Toledo), which is approximately $200,000 less than the proposed amount.

**Unsuccessful Proposals Submitted as Part of Scheme**

88.     A search of NSF records revealed five additional proposals submitted by GENZIKO to that agency, which ultimately were not funded. These proposals were all submitted to NSF by GENZIKO and NEAR via wire, between June 10, 2008 and November 17, 2009. A review of the proposals reveals that each of them contained misrepresentations regarding a facility rental agreement with Georgia Tech. Additionally, Professor B is listed as

28

personnel on two of the proposals.  However, as discussed above, Professor B informed me

that she never agreed to work with GENZIKO or NEAR on any NSF project.  The table below

summarizes these proposals which, while never funded by the agency, nevertheless were part

of the wire fraud scheme:

| Date | Proposal No. | Title | Requested Amount | Misrepresentations |
|------|--------------|-------|------------------|--------------------|
| 6/10/08 | 0839605 | SBIR Phase I:  High Energy Output Piezoelectric Material | $99,990 | That GENZIKO has a rental agreement with Georgia Tech. That GENZIKO has 4 employees. |
| 2/25/09 | 0930712 | STTR Phase I:  High Performance Smart Heat Ejector Fins for Thermal Management | $149,956 | That GENZIKO has a rental agreement with Georgia Tech, and that Professor B would serve as an Investigator.  That GENZIKO has 4 employees. |
| 2/25/09 | 0930771 | STTR Phase I: Multifunctional Serpentine Rosettes for Multiaxial Sensing and Control | $149,998 | That GENZIKO has a rental agreement with Georgia Tech. That GENZIKO has 4 employees. |
| 7/28/09 | 0956845 | SBIR Phase II:  High Performance Vibration Energy Harvester | $444,225 | That GENZIKO has a rental agreement with Georgia Tech. That GENZIKO has 5 employees. |
| 11/17/09 | 1010399 | STTR Phase I:  High Performance Smart Heat Ejector Fins for Thermal Management | $149,956 | That GENZIKO has a rental agreement with Georgia Tech, and that Professor B would serve as an Investigator.  That GENZIKO has a cooperative research agreement with Georgia Tech.  That GENZIKO has 3 employees. |
|  |  |  | $990,125 |  |

**Additional Probable Cause Information**

89.     In my training and experience, individuals routinely maintain records of their
accounts, financial records and other documents such as travel and business records in their
residences and on computers.

90.     All 8 of the proposals listed above, whether funded or not, appear to have been
prepared by NEAR on a computer.  All 8 of the proposals were submitted by wire transmission
to NSF or NASA.

91.     The only 2 addresses of record that I have learned of from any source for
GENZIKO are a UPS Mailbox and the Compass Pointe address.  Thus, I believe that NEAR
performs all administrative work related to GENZIKO, including the preparation of contract
proposals, correspondence with scientists, and maintenance of financial records, at the
Compass Pointe address.